# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

```
_____
                                  )
NATIONAL MOTOR FREIGHT            )
TRAFFIC ASSOCIATION, INC., et al.,)
                                  )
          Plaintiffs,             )
                                  )
     v.                           )        Civil Action No. 13-0429 (ABJ)
                                  )
GENERAL SERVICES                  )
ADMINISTRATION, et al.,           )
                                  )
          GSAs.                   )
_____)
```

## MEMORANDUM OPINION

Plaintiffs National Motor Freight Traffic Association, Inc. ("NMFTA"), ABF Freight System, Inc., T.F. Boyle Transportation, Inc. d/b/a Boyle Transportation, Bed Rock, Inc. d/b/a Tri-State Motor Transit Co., and YRC Inc. d/b/a YRC Freight[1] filed this case against defendant General Services Administration ("GSA") in April 2013.[2] *See* Compl. [Dkt. # 1]. The four individual plaintiffs are motor carriers that provide government agencies with transportation services at negotiated commercial rates. Over a period of years, GSA has conducted post-payment audits of their bills up to three years after the reviewed charges were paid.

Plaintiffs filed this case to challenge that practice, arguing that GSA exceeded its statutory authority when it conducted those audits because 31 U.S.C. § 3726 (2012) does not

---

1    New England Motor Freight, Inc. was dismissed as a plaintiff in this case as part of the Court's ruling on the motion to dismiss. *See Nat'l Motor Freight Traffic Ass'n v. GSA*, No. 13-429, 2014 WL 958599, at *10 (D.D.C. Mar. 12, 2014).

2    Daniel M. Tangherlini is also named in his official capacity as Acting Administrator of GSA as a defendant in this case. For ease of reference, however, the Court will refer to defendants collectively as GSA.

cover transportation contracts performed at negotiated commercial rates, and therefore any government review must be conducted pursuant to 49 U.S.C. § 13710 (2012), which requires that billing disputes be raised within 180 days. *See* Pls.' Mem. of P. & A. in Supp. of Pls.' Mot. for Summ. J. & in Opp. to Def.'s Mot. for Summ. J. ("Pls.' Mot.") [Dkt. # 25-1]. Alternatively, plaintiffs contend that even if GSA can audit their bills under section 3726, the agency is still required to notify carriers of any disputed charges within the time limit set by section 13710, and it did not do so here. GSA maintains that section 3726(b) and (d) provide it with authority to conduct the challenged audits and that it is not bound by the time limit contained in section 13710. Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Mot.") [Dkt. # 24].

Both parties have moved for summary judgment. *See* Def.'s Mot. for Summ. J. [Dkt. # 24]; Pls.' Mot. for Summ. J. [Dkt. # 25]. Because the Court finds that GSA has authority under section 3726 to conduct the challenged audits in this case, and that the time limit in section 13710 does not apply, the Court will grant GSA's motion for summary judgment and deny plaintiffs' cross-motion for summary judgment.

## BACKGROUND

### I.      Statutory and Regulatory Background

The crux of this case is whether GSA has statutory authority under 31 U.S.C. § 3726 to conduct post-payment audits of bills that calculate charges using negotiated commercial rates. If the answer is yes, then the complaint raises a second question regarding the interplay between section 3726 and 49 U.S.C. § 13710.

#### A.      31 U.S.C. § 3726 and 41 C.F.R. § 102-118.415 *et seq.*

Section 3726 of title 31 of the United States Code governs both pre- and post-payment audits of bills received by the government for transportation services. 31 U.S.C. § 3726(a)–(b). Subsection (b) provides that "[t]he Administrator [of General Services] may conduct pre- or

post-payment audits of transportation bills of any Federal Agency. The number and types of bills audited shall be based on the Administrator's judgment." *Id.* § 3726(b). If an audit reveals that the government overpaid for the services provided, the government may, "[n]ot later than 3 years (excluding time of war) after the time a bill is paid, . . . deduct from an amount subsequently due a carrier or freight forwarder an amount paid on the bill that was greater than the rate allowed under" one of the types of rates listed in the statute. *Id.* § 3726(d). If the challenged transportation charges are not billed at a rate specified in one of the three subsections of section 3726(d), then GSA does not have authority under section 3726 to withhold overcharges. Those subsections are:

> (1) a lawful tariff under title 49 or on file with the Secretary of Transportation with respect to foreign air transportation . . . , the Federal Maritime Commission, or a State transportation authority;

> (2) a lawfully quoted rate subject to the jurisdiction of the Surface Transportation Board; or

> (3) sections 10721, 13712, and 15504 of title 49 or an equivalent arrangement or an exemption.

*Id.*

The statute does not specify the procedures that GSA must follow when reviewing agency transportation bills, but GSA has promulgated regulations establishing an audit procedure and appeals process. *See* 41 C.F.R. §§ 102-118.435, 102-118.600, 102-118.625, 102-118.650, 102-118.655 (2009). It also published questions and answers to provide additional guidance to government agencies that contract with transportation providers. *See generally* 41 C.F.R. § 102-118.5 *et seq.*

Most pertinent to this case are sections 102-118.435(f) and 102-118.35 of the regulations. Section 102-118.435(f) provides that if the Audit Division discovers an overcharge, GSA will "[i]ssue a Notice of Overcharge stating that [the motor carrier] owes a debt to the agency," and

that the notice will include information regarding "the amount paid, the basis for the proper charge for the document reference number, and [the] applicable tariff or tender along with other data relied on to support the overcharge." *Id.* § 102-118.435(f).  The regulations do not require that notices of overcharges be sent within a specific time period.  *See id.*

Section 102-118.35 defines terms used in GSA's regulations.  Among other things, it defines "post-payment audit" as "an audit of transportation billing documents after payment to decide their validity, propriety, and conformity with tariffs, quotations, agreements, or tenders." *Id.* § 102-118.35; *see also* Def.'s Statement of Undisputed Material Facts ("Def.'s SOF") ¶ 2 [Dkt. # 24].  It further explains that the post-payment audit "process may . . . include subsequent adjustments and collections actions taken against [transportation service providers] by the Government." 41 C.F.R. § 102-118.35.

## B.      49 U.S.C. § 13710

As noted above, there is another statute with potential application to this case.  Section 13710 of title 49 of the United States Code governs, among other things, billing disputes between motor carriers and shippers.  49 U.S.C. § 13710(a)(3).  Specifically, it provides that, "[i]f a shipper seeks to contest the charges originally billed or additional charges subsequently billed, the shipper may request that the [Surface Transportation] Board determine whether the charges billed must be paid." *Id.* § 13710(a)(3)(B).  A shipper must raise a challenge to the transportation charges "within 180 days of receipt of the bill," otherwise the challenge is time-barred. *Id.*

Although the statute does not specifically define "shipper" or elaborate upon the term, the statute has been applied to government agencies that contract for transportation services.  The

statute defines "motor carrier" as a motor carrier of property "other than a motor carrier providing transportation in noncontiguous domestic trade." *Id.* § 13710(a)(1).

## II.     Factual and Procedural Background

Plaintiffs are four individual motor carriers and a trade association comprised of motor carriers. *See* Compl. ¶¶ 4–6, 8–9. The membership organization, NMFTA, is a nonprofit entity "whose membership consists of motor carriers of freight and transportation companies operating in interstate, intrastate, and foreign commerce," many of which "provide cargo transportation services for the United States government." Compl. ¶ 4; *see also* Compl. ¶ 20. The other four plaintiffs are "motor carrier member[s] of NMFTA." Compl. ¶¶ 5–6, 8–9. All four transport nonhousehold goods for the federal government, and "all of the freight movement[] at issue in this case [is] moved at commercial rates set forth in tenders that the carriers submit to various agencies," as opposed to regulated tariffs under title 49 of the United States Code. Pls.' Statement of Undisputed Material Facts ("Pls.' SOF") ¶¶ 2–4, 6 [Dkt. # 25-2]. Each of the four individual motor carrier plaintiffs transports goods "in interstate commerce throughout the United States and Canada." Compl. ¶¶ 5–6, 8–9.

After a delivery is completed, the individual motor carrier sends an invoice to the agency for which it provided the transportation services. Pls.' SOF ¶ 7. Although the agency is required to conduct a pre-payment audit to ensure the accuracy of the bill, GSA may also, in some circumstances, conduct a post-payment audit. *See* 31 U.S.C. § 3726(a)–(b). If an overpayment is discovered, GSA will issue a notice of overcharge to the carrier involved. Pls.' SOF ¶ 8; *see also* 41 C.F.R. § 102-118.435(f).

NMFTA and its members contend that GSA has increased the number of these "post-payment audits of transportation bills for transportation services provided to Government

shippers," and they object to the fact that the post-payment audits resulted in the issuance of thousands of notices of overcharge that demanded refunds of money "between 2 and 3 years after the Government was billed for the involved transportation services." Compl. ¶¶ 22–23. Specifically, the following overcharge notices were received approximately one to three years after the government received the transportation bills:

- ABF Freight:  In 2009, ABF Freight received 1,483 notices, totaling more than $401,000 in overcharges that it must repay.  In 2010, it received 2,662 notices, amounting to more than $507,000 in repayments.  In 2012, it received 347 notices, seeking repayment of more than $27,000.  And in 2013, it received 144 notices, totaling more than $137,000. Pls.' SOF ¶ 9; *see also* Compl. ¶ 24.

- Boyle:  In 2010, Boyle received 257 notices, totaling about $71,000 in overcharges that it must repay.  In 2011, it received 255 notices, amounting to approximately $186,000 in repayments.  And in 2012, it received 131 notices, seeking repayment of about $121,000. Pls.' SOF ¶ 10; *see also* Compl. ¶ 25.

- Tri-State Motor:  In 2009, Tri-State Motor received 27 notices, totaling about $71,000 in overcharges that it must repay.   In 2010, it received 524 notices, amounting to approximately $160,000 in repayments.  And in 2011, it received 181 notices, seeking repayment of about $62,000.  Pls.' SOF ¶ 11; *see also* Compl. ¶ 27.

- YRC:  In 2011, YRC received 2,310 notices, totaling about $600,000 in overcharges that it must repay.  In 2012, it received 1,310 notices, seeking repayment of about $418,000. And in 2013, it received 1,272 notices, amounting to approximately $380,538.  Pls.' SOF ¶ 12; *see also* Compl. ¶ 28.[3]

On April 4, 2013, plaintiffs filed the instant lawsuit to press their claim that GSA acted unlawfully in issuing the notices of overcharge to ABF Freight, Boyle, Tri-State Motor, and YRC, as well as to other NMFTA members.  Count I alleges that GSA exceeded its statutory authority under 31 U.S.C. § 3726 when it conducted post-payment audits of plaintiffs' bills because those bills were calculated using negotiated commercial rates, which plaintiffs claim do

---

3       The Court notes that it expresses no opinion regarding the accuracy of the alleged overcharges or plaintiffs' liabilities for the amounts noticed.   This case deals only with the narrow legal issue of whether GSA had the statutory authority to conduct the audits in the first place.

"not fall into the categories of freight still subject to GSA post-payment audits and offset pursuant to [section] 3726." Compl. ¶¶ 30–31. Building on Count I, Count II claims that GSA's audit power must be derived from 49 U.S.C. § 13710, and that GSA violated that provision because it requires billing disputes to be raised within 180 days of the bill's receipt. Compl. ¶¶ 32–37. And Count III contends that, to the extent that GSA has authority to audit plaintiffs' bills under section 3726, GSA's conduct was nevertheless unlawful because it must abide by section 13710's time limit when exercising its section 3726 authority, and GSA did not act within that time period here. Compl. ¶¶ 38–43.

On July 11, 2013, GSA filed a motion to dismiss the complaint, arguing that this Court lacked subject matter jurisdiction pursuant to the Tucker Act, 28 U.S.C. § 1491 (2012). *See* Def.'s Mot. to Dismiss at 12–17 [Dkt. # 11]. It also argued in the alternative that the complaint failed to state a claim upon which relief may be granted. *Id.* at 17–27.

The Court denied GSA's motion to dismiss on March 12, 2014, finding that it had jurisdiction under the Little Tucker Act, 28 U.S.C. § 1346 (2012), and that GSA's challenge to the sufficiency of the complaint involved a question of law that should be decided at the summary judgment stage. *Nat'l Motor Freight Traffic Ass'n v. GSA*, No. 13-429, 2014 WL 958599, at *8–9 (D.D.C. Mar. 12, 2014). The parties then filed cross-motions for summary judgment.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). To defeat summary judgment, the non-moving party must "designate specific facts showing there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). The existence of a factual dispute is insufficient to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is only "material" if it is capable of affecting the outcome of the litigation. *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). In assessing a party's motion, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the summary judgment motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations omitted), quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam).

"The rule governing cross-motions for summary judgment . . . is that neither party waives the right to a full trial on the merits by filing its own motion; each side concedes that no material facts are at issue only for the purposes of its own motion." *Sherwood v. Washington Post*, 871 F.2d 1144, 1148 n.4 (D.C. Cir. 1989), quoting *McKenzie v. Sawyer*, 684 F.2d 62, 68 n.3 (D.C. Cir. 1982). In assessing each party's motion, "[a]ll underlying facts and inferences are analyzed in the light most favorable to the non-moving party." *N.S. ex rel. Stein v. District of Columbia*, 709 F. Supp. 2d 57, 65 (D.D.C. 2010), citing *Anderson*, 477 U.S. at 247.

## ANALYSIS

### I.      GSA is entitled to summary judgment on Counts I and II.

Count I of the complaint alleges that GSA exceeded its statutory authority when it conducted post-payment audits of plaintiffs' transportation bills under 31 U.S.C. § 3726 because plaintiffs move freight at negotiated commercial rates, which they claim do not fall within the

types of rates subject to GSA's audit authority. Compl. ¶¶ 29–31. In Count II, plaintiffs go on to contend that, therefore, GSA can only contest plaintiffs' bills under 49 U.S.C. § 13710, and that GSA violated that provision because they did not dispute the bills in question within that statute's 180 day limit. *See id.* ¶¶ 32–37. So the initial question the Court must consider is whether GSA's post-payment audits of plaintiffs' bills were authorized by section 3726(d).

Where, as here, a plaintiff challenges an agency action that interprets a statute the agency administers, the Court is required to analyze an agency's interpretation of the statute by following the two-step procedure set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc. See* 467 U.S. 837 (1984); *see also City of Arlington, Tex. v. FCC*, 133 S. Ct. 1863, 1871 (2013). First, the Court must determine "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43. But if the Court concludes that the statute is either silent or ambiguous with respect to the issue in question, the second step of the Court's review process is to determine whether the interpretation proffered by the agency is "based on a permissible construction of the statute." *Id.* at 843. Applying that framework here, the Court concludes that GSA is entitled to summary judgment on Count I and that Count II is moot.

**A.** *Chevron* **step one.**

At *Chevron* step one, the court is to "use 'traditional tools of statutory construction' to determine whether Congress has unambiguously expressed its intent" on the precise issue presented in the case. *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1319 (D.C. Cir. 1998), quoting *Chevron*, 467 U.S. at 843. This requires the court to examine the statute's text, structure,

purpose, and legislative history. *Bell Atl. Tel. Cos. v. FCC*, 131 F.3d 1044, 1047 (D.C. Cir. 1997).

The issue before the Court in this case is whether GSA may conduct post-payment audits of plaintiffs' transportation bills, which use negotiated commercial rates, pursuant to section 3726(d). As a result, the starting point in the Court's analysis is the text of that section, which lays out GSA's authority to deduct overcharges discovered during the audit.[4] Section 3726(d) provides, in pertinent part, that within three years of when a bill is paid, the government may deduct from an amount subsequently due to a carrier:

> an amount paid on the bill that was greater than the rate allowed under –
>
> (1) a lawful tariff under title 49 or on file with the Secretary of Transportation with respect to foreign air transportation . . . , the Federal Maritime Commission, or a State transportation authority;
>
> (2) a lawfully quoted rate subject to the jurisdiction of the Surface Transportation Board; or
>
> (3) sections 10721, 13712, and 15504 of title 49 or an equivalent arrangement or an exemption.

31 U.S.C. § 3726(d). Neither subsection (d)(1) nor subsection (d)(3) is applicable here, so the key question in this case becomes: are the rates charged in plaintiffs' bills "lawfully quoted rate[s] subject to the jurisdiction of the Surface Transportation Board?"

The jurisdiction of the Surface Transportation Board is set out in part in Chapter 135 of Title 49 of the U.S. Code, which provides that the Board has jurisdiction over transportation by motor carriers, and the procurement of that transportation, to the extent that it moves between the

---

4       Although the limitations on GSA's audit authority are contained in subsection (d), it is subsection (b) that grants the agency the authority to conduct audits. Subsection (b) is broad and leaves to "the Administrator's judgment" the "number and *types* of bills audited." 31 U.S.C. § 3726(b) (emphasis added). It is against that broad delegation of authority that the Court must read section 3726(d)(2).

particular locations listed in the statute.[5]  49 U.S.C. § 13501.  Plaintiffs in this case are motor carriers, and the transportation bills at issue fall within the purview of the Board's jurisdiction under section 13501.  Compl. ¶¶ 5–6, 8–9.  As a result, it appears from the plain text of the statute that plaintiffs' bills are covered by section 3726(d)(2) and are therefore subject to GSA's post-payment audit authority.

Plaintiffs challenge that conclusion, and in support of their position, point to three sections of chapter 137 in title 49 that specify the limited categories of rates that the Surface Transportation Board is permitted to review for lawfulness or

---

5       Section 13501 provides:

> The Secretary and the Board have jurisdiction, as specified in this part, over transportation by motor carrier and the procurement of that transportation, to the extent that passengers, property, or both, are transported by motor carrier –
>
> (1) between a place in –
>
>> (A) a State and a place in another State;
>>
>> (B) a State and another place in the same State through another State;
>>
>> (C) the United States and a place in a territory or possession of the United States to the extent the transportation is in the United States;
>>
>> (D) the United States and another place in the United States through a foreign country to the extent the transportation is in the United States; or
>>
>> (E) the United States and a place in a foreign country to the extent the transportation is in the United States . . . .

49 U.S.C. § 13501.

reasonableness: 49 U.S.C. §§ 13701, 13702, 13703 (2012).[6] But contrary to plaintiffs' suggestion, the existence of those three rate specific provisions in the statute governing the Surface Transportation Board does not mean that those types of rates are the only "lawfully quoted rates" over which the Board has jurisdiction. Neither of the three sections are jurisdictional provisions, and neither purport to narrow the scope of the Board's jurisdiction. *See* 49 U.S.C. §§ 13701, 13702, 13703. Section 13701 simply provides that a particular subset of the rates that may be offered "by a carrier *subject to jurisdiction under chapter 135*" must be reasonable, *id.* § 13701(a)(1) (emphasis added); section 13702 simply states that a different subset of services offered "by a carriers *subject to jurisdiction under chapter 135*" require regulated tariffs, *id.* § 13702(a) (emphasis added); and section 13703 permits motor carries providing transportation or services "*subject to jurisdiction under chapter 135*" to enter agreements with one another in order to establish, among other things, jointly made rates. *Id.* § 13703(a)(1) (emphasis added). So, these provisions do not illuminate or limit what is meant by the phrase "lawfully quoted rate[s] subject to the jurisdiction of the Surface Transportation Board" found in section 3726(d)(2).

Nonetheless, plaintiffs contend that negotiated commercial rates do not fall under the broad language of section 3726(d)(2), and they maintain that section 3726(d)(2) calls for audits

---

6    Section 13701 provides that "[a] rate, classification, rule, or practice related to transportation or service provided by a carrier subject to jurisdiction under chapter 135 for transportation or service involving" the listed categories of transportation "must be reasonable." 49 U.S.C. § 13701(a)(1).
    Section 13702 states that in certain circumstances, "a carrier subject to jurisdiction under chapter 135 may provide transportation or service that is" in noncontiguous domestic trade or for movement of household goods "only if the rate for such transportation or service is contained in a tariff that is in effect under this section." *Id.* § 13702(a).
    Section 13703 states that in certain circumstances, "[a] motor carrier providing transportation or service subject to jurisdiction under chapter 135 may enter into" various types of agreements, including jointly made rates, with other motor carriers. *Id.* § 13703(a)(1).

of only a limited category of bills submitted to the government: those charging jointly made rates or rates subject to statutory reasonableness requirements. Pls.' Mot. at 16, 18–19. This limitation is not apparent in the text, but the Court's analysis does not end with the text: the D.C. Circuit has instructed that a district court should also consider the purpose, structure, and legislative history of a statutory provision at *Chevron* step one. *Bell Atl. Tel. Cos.*, 131 F.3d at 1047.

The purpose of section 3726 is obvious: it is meant to ensure that the federal government is not overcharged for the transportation services it procures. Prior to the deregulation of the transportation industry and section 3726(d)'s amendment in 1995, GSA was authorized to audit bills and deduct amounts charged that were greater than the rates specified by:

> (1) a lawful tariff on file with the Interstate Commerce Commission, the Secretary of Transportation with respect to foreign air transportation (as defined in the Federal Aviation Act of 1958), the Federal Maritime Commission, or a State transportation authority; or

> (2) sections 10721-10724 of title 49 or an equivalent arrangement or an exemption.

*See* Interstate Commerce Commission Termination Act of 1995, Pub. L. No. 104-88, § 306, 109 Stat. 803, 945 (setting forth the prior version of section 3726(d)). Motor carriers, such as plaintiffs, were required to file tariffs at that point, and therefore GSA exercised audit and deduction authority over them under subsection (d)(1).

But in 1995, Congress abolished the tariff requirement for many types of transportation, including the motor carrier industry, and it amended section 3726(d). *See id*. The above subsections of section 3726(d) were renumbered as (1) and (3); the reference to the Interstate Commerce Commission in subsection (d)(1) was removed; the sections specified in the new subsection (d)(3) were updated to reflect changes in the Code; and Congress created a new

category of rates to be audited, which is now found in subsection (d)(2). *Id.* The fact that Congress created a new category of bills subject to GSA's post-payment audit authority simultaneously with its deregulation of many areas of the transportation industry suggests that the purpose of subsection (d)(2) was to ensure that the sorts of transportation charges that were previously covered by section 3726 continued to be subject to GSA's audit authority after 1995.

The structure of the statute also indicates that Congress intended subsection (d)(2) to refer to the Surface Transportation Board's jurisdiction broadly. Section 3726(d) lists three subcategories of bills that GSA may audit to determine if there was an overpayment. Subsection (d)(1) identifies bills involving tariffs, *id.* § 3726(d)(1), and subsection (d)(3) covers bills issued under three statutes that deal with situations where the transportation at issue is otherwise subject to a tariff, but the government is permitted to negotiate a lower rate. *See id.* § 3726(d)(3) (listing 49 U.S.C. §§ 10721, 13712, 15504); *see also Munitions Carriers Conference, Inc. v. United States*, 147 F.3d 1027, 1031 (D.C. Cir. 1998) (noting that section 10721 related to discounts the government could obtain from applicable commercial rates, which it interpreted to mean tariffs). Ordinary principles of statutory construction would indicate that subsection (d)(2) must be intended to cover something different in order to avoid rendering it superfluous. *See Pa. Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 562 (1990) ("Our cases express a deep reluctance to interpret a statutory provision so as to render superfluous other provisions in the same enactment."); *Davis Cnty. Solid Waste Mgmt. v. EPA*, 101 F.3d 1395, 1404 (D.C. Cir. 1996)

("[I]t is of course a well-established maxim of statutory construction that courts should avoid interpretations that render a statutory provision superfluous.").[7]

What Congress intended subsection (d)(2) to cover is illuminated by its decision to employ more general terms in subsection (d)(2) as compared to the specific terms in subsections (d)(1) and (d)(3).  *Compare* 31 U.S.C. § 3726(d)(2), *with id.* § 3726(d)(3) (listing specific statutory provisions), *and id.* § 3726(d)(1) (specifying that it covers tariffs).  Congress knew how to and could have limited subsection (d)(2) to apply to only certain types of rates, such as rates subject to reasonableness requirements as plaintiffs suggest, *see* Pls.' Mot. at 16, but it did not do so.

The Court's reading of section 3726(d)(2) is further reinforced when that section is considered in tandem with 49 U.S.C. § 13710.  As both parties seem to agree, that section provides the Surface Transportation Board with jurisdiction over a billing dispute regardless of whether the bill involved a regulated rate or a negotiated commercial rate.  *See* Compl. ¶¶ 32–37 (alleging that GSA's authority to dispute plaintiffs' bills must be brought under 49 U.S.C. § 13710); Def.'s Mot. at 9.  As a result, section 13710 shows that disputes involving negotiated commercial rates – not just those dealing with the reasonableness of rates for certain kinds of transportation – fall within the Board's *jurisdiction*.

---

7       Plaintiffs rely heavily on the legislative history of section 3726 and the overall deregulation of the transportation industry in support of their position that GSA exceeded its statutory authority.  *See* Pls.' Mot. at 22–23, 25–26.  But the Court finds that the legislative history does not shed much light on Congress's intent regarding negotiated commercial rates.  Although the industry was deregulated because of Congress's determination that there was sufficient competition in the market and that a free market would work best to set prices, it nonetheless left in place GSA's post-audit authority, and it added subsection (d)(2), clearly indicating that it intended that authority to extend beyond the tariffs covered by subsection (d)(1) and the government discounted rates covered by subsection (d)(3).  What it particularly intended subsection (d)(2) to cover, however, is not evident from the legislative history alone.

Finally, Congress's intent to adopt a broad definition of the Board's jurisdiction in subsection (d)(2) that would encompass bills utilizing negotiated commercial rates is evidenced by its use of the words "lawfully" and "quoted."  The word "lawfully" indicates that Congress intended to refer broadly to any valid or lawful rate, not just those subject to statutory reasonableness requirements.[8]   31 U.S.C. § 3726(d)(2).  And the word "quoted" seems to refer to the very sorts of negotiated rates that are used in plaintiffs' transportation contracts.

Taken together, the above points would permit this Court to conclude that this matter can and should be resolved at the first level of the *Chevron* analysis.  But the Court finds that there is a certain level of ambiguity in the statute:  section 3726(d)(2) – which authorizes the GSA audits – is phrased in terms of bills that exceed the "rates" subject to the jurisdiction of the Board, *see* 31 U.S.C. § 3726(d), while the jurisdictional provision itself covers "transportation . . . and the procurement of that transportation" and does not use the term "rates."  49 U.S.C. § 13501.  One could argue that "procurement of . . . transportation" embraces rates, but to the extent that subsection (d)(2) is rendered ambiguous by the inclusion of the word "rate," the Court finds that it should proceed to *Chevron* step two.

### B.  *Chevron* step two.

Under the second step of the *Chevron* analysis, the sole question for the Court to consider is whether the agency's construction of the statute it was tasked to administer is permissible. *Chevron*, 467 U.S. at 843.  At this stage, the agency's interpretation of that statute is entitled to considerable weight and deference.  *Id*. at 844; *Serono*, 158 F.3d at 1321.  Indeed, "under

---

8    For this reason, the Court is not persuaded plaintiffs' point that the Surface Transportation Board's jurisdiction is limited to the extent that it can only review the validity of regulated rates.  *See* Pls.' Mot. at 13–15; Pls.' Reply in Supp. of Pls.' Mot. at 4 [Dkt. # 30].  It also notes that the parties' dispute about whether the Board's decisions under section 13710 are advisory has no bearing on the question before the Court; whether the Board has jurisdiction does not depend on whether it has enforcement authority over its decisions.

*Chevron*, courts are bound to uphold an agency interpretation as long as it is reasonable – regardless whether there may be other reasonable, or even more reasonable, views." *Serono*, 158 F.3d at 1321. The Supreme Court explained:

> If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious or manifestly contrary to the statute. Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.

*Chevron*, 467 U.S. at 843–44 (footnote omitted).

Here, GSA has interpreted section 3726(d)(2) to include negotiated commercial rates. *See* 41 C.F.R. § 102-118.35; Def.'s Mot. at 15. And for the reasons underlying the Court's *Chevron* step one analysis, the Court finds that GSA's interpretation of subsection (d)(2) is a permissible construction of the statute. *See Am.'s Cmty. Bankers v. FDIC*, 200 F.3d 822, 836 (D.C. Cir. 2000) ("It is fixed law of *Chevron* jurisprudence . . . that we may employ the traditional tools of statutory interpretation in determining both whether the meaning of the language is clear at *Chevron* step one and whether the agency's interpretation is a reasonable on at *Chevron* step two."). The Surface Transportation Board's general jurisdiction is broad, and nothing in the text, purpose, or structure of section 3726 forecloses an interpretation of section 3726(d)(2) that includes negotiated commercial rates. The Court must therefore defer to GSA's interpretation of its audit authority. *See Serono*, 158 F.3d at 1321.

Plaintiffs' remaining arguments do not point to a different conclusion. First, they argue that Congress's use of the word "rate" means that GSA's audit power is limited to bills involving those "rates" that are subject to statutory reasonableness requirements. Pls.' Mot. at 16. While the use of the word "rate" may create some ambiguity, it does not lead to the conclusion that

Congress meant to limit section 3726(d)(2)'s coverage. Section 3726 creates an auditing scheme that includes the collection of overpayments, and use of the word "rate" in subsection (d)(2) can be explained by the fact that it parallels the introductory part of that section, which provides that the government is authorized to collect "an amount paid on the bill that was greater than the *rate* allowed." *Id.* § 3726(d) (emphasis added). The word "rate" therefore does not necessarily indicate congressional intent to restrict subsection (d)(2) to bills based on "rates" that the Board can review for reasonableness or lawfulness.

Next, plaintiffs argue that Congress did not intend subsection (d)(2) to include negotiated commercial rates because, in the wake of deregulation, it is much easier for agencies to determine pre-payment if they are being charged the proper rate. Pls.' Mot. at 6–12; Pls.' Reply in Supp. of Pls.' Mot. ("Pls.' Reply") at 6 [Dkt. # 30]. Plaintiffs also point to GSA's regulation, which provides that post-payment audits will only be used periodically to check the efficacy of the mandatory pre-payment audits, as further authority for the proposition that pre-payment audits are all that is needed in the context of a billing dispute involving negotiated commercial rates. Pls.' Mot. at 11; Pls.' Reply at 5–6, citing 41 C.F.R. § 102-118.405. But that policy argument does not render GSA's interpretation impermissible.

Congress did not eliminate GSA's post-payment audit authority in the wake of deregulation. *See* 109 Stat. at 945. Indeed, it took steps to ensure that deregulation did not totally eliminate GSA's authority to audit non-tariff based rates when it added subsection (d)(2) in 1995. Although plaintiffs' proffered interpretation of that section to include only rail rates, pipeline rates, jointly made rates, and other rates subject to reasonableness requirements might be one permissible construction of the statute, GSA's construction of it to include negotiated commercial rates is also permissible. And the Court must uphold the agency's interpretation so

long as it is reasonable, even if another reasonable, or even more reasonable, construction exists. *Serono*, 158 F.3d at 1321.

And even if the law called upon the Court to rank potential interpretations, GSA's construction is more consistent with the statutory text, structure, and purpose. There is no indication that Congress intended the much narrower interpretation that plaintiffs put forth. GSA had broad audit authority prior to deregulation, and it was permitted to audit motor carriers such as plaintiffs under that authority. Deregulation reduced the need to file tariffs and limited the types of rates subject to reasonableness requirements, but Congress did not eliminate GSA's post-audit authority or demonstrably decrease its scope.

Accordingly, the Court will defer to GSA's interpretation that section 3726(d)(2) covers negotiated commercial rates as long as the underlying contract falls within the jurisdiction of the Surface Transportation Board. The parties do not dispute that plaintiffs' bills fall within that description. As a result, GSA acted within its section 3726 authority when it audited plaintiffs' transportation bills in this case, and GSA is entitled to summary judgment on Count I. Count II is therefore moot because GSA did not act pursuant to section 13710.[9]

---

[9] Plaintiffs pleadings in connection with their motion for summary judgment blur the lines between Count II – which alleges that GSA violated section 13710 – and Count III – which alleges that, if GSA has authority to act under section 3726, the 180 day time limit in section 13710 should apply. Pls.' Mot. at 21–26; Pls.' Reply at 6–8; *see also id.* at 6 ("The legal issue raised in Count II is whether GSA has either the 180-day time period set forth in 49 U.S.C. § 13710(a)(3)(B) for contesting transportation charges or the three-year time period set forth in 31 U.S.C. § 3726(d) for making deductions from amounts subsequently due carriers [sic] to issue Notices of Overcharge to involved carriers."). The Court will adhere to the statement of the counts in the complaint, *see* Compl. ¶ 37 ("GSA's issuance of Notices of Overcharge more than 180 days of receipt of the transportation bill is not in accordance with GSA's statutory authority under 49 U.S.C. § 13710(a)(3)(B) . . . ."), and therefore finds Count II moot in light of its decision on Count I. Any remaining arguments made by plaintiffs in its discussion of Count II will be considered in connection with the Court's analysis of Count III.

## II.    GSA is entitled to summary judgment on Count III.

In Count III, plaintiffs contend that if GSA may conduct post-payment audits of bills using negotiated commercial rates, then it must do so within 180 days of the agency's receipt of the bill.  Compl. ¶¶ 38–43.  Put differently, plaintiffs contend that GSA's authority to contest charges – as opposed to its authority to deduct overpayments from subsequent bills – must be exercised in accordance with 49 U.S.C. § 13710.  *Id.*; *see also* 49 U.S.C. § 13710(a)(3)(B). Because GSA issued notices of overcharge to plaintiffs beyond that statute's 180 days limit, plaintiffs contend that GSA acted unlawfully.  The Court disagrees.

As with Count I, the Court's inquiry in Count III is governed by *Chevron*'s two-step process because plaintiffs challenge GSA's interpretation of a statute.  This count, however, cannot be decided at *Chevron* step one.

GSA's authority to conduct post-payment (and pre-payment) audits is found in section 3726(b).  That subsection does not contain either a time limit by which an audit must be conducted or the procedures that GSA must follow when auditing and subsequently deducting overcharges.  31 U.S.C. § 3726(b).  The only time limit specified in the statute is found in section 3726(d), which provides that overpayments must be deducted from subsequent amounts due "[n]ot later than 3 years (excluding time of war) after the time a bill is paid."  *Id.* § 3726(d).

Moreover, the thrust of plaintiffs' allegation in Count III is that the notices GSA sent regarding overcharges were untimely.  But section 3726 does not require GSA to issue notices of overcharges to entities like plaintiffs.  *Id.* § 3726.  That requirement was created by GSA's regulations implementing its post-payment audit authority.  41 C.F.R. § 102-118.435(f).  As a result, the Court finds that Congress has not spoken on the issue of whether GSA's section 3726

authority to allege overcharges must be exercised within the 180 day limit set by section 13710, and the Court must therefore go on to *Chevron* step two.

The gap that Congress left for GSA to fill in section 3726 is broad: "The Administrator may conduct pre–or post-payment audits of transportation bills of any Federal agency. The number and types of bills audited shall be based on the Administrator's judgment." 31 U.S.C. § 3726(b). It not only does not include whether there is a time limit to notify an entity of an overcharge, but also the entire procedure that GSA should follow when exercising its audit authority. *See id.* GSA filled that gap by promulgating a regulation that specifies the procedures it will use when conducting post-payment audits. *See* 41 C.F.R. § 102-118.435. Because there was an implicit delegation of authority to GSA to fill that gap, the Court must uphold the agency's interpretation as long as it is reasonable. *Chevron*, 467 U.S. at 843–44.

Most pertinent to this case is subsection (f) of GSA's regulation, which provides that upon discovery of an overcharge, GSA will:

> Issue a Notice of Overcharge stating that a [transportation provider] owes a debt to the agency. This notice states the amount paid, the basis for the proper charge for the document reference number, and cites applicable tariff or tender along with other data relied on to support the overcharge. A separate Notice of Overcharge is prepared and mailed for each bill.

41 C.F.R. § 102-118.435(f). Although it specifies the content to be included in the notice, the regulation does not include a time limit for the notice's issuance. *Id.* As GSA explains: "GSA, in its discretion, did not establish a timeframe for issuance of a Notice of Overcharge. Rather, pursuant to its regulations, as long as the deductions occur within the three year time period in section 3726(d), the GSA may complete the intermediary steps at any time." Def.'s Mot. at 22.

GSA has therefore interpreted its authority to audit entities and collect overcharges as being constrained only by the three year time limit set by section 3726(d).[10]

The Court finds that interpretation to be a reasonable and permissible construction of the statute, and it must therefore defer to GSA's interpretation. *Chevron*, 467 U.S. at 843–44; *Serono*, 158 F.3d at 1321. As noted above, nothing in section 3726 requires GSA to issue notices of overcharge, let alone to issue them within a certain time period. 31 U.S.C. § 3726(b). Congress knows how to impose time limits, *see, e.g.*, 49 U.S.C. § 13710(a)(3)(B), and it imposed a three year limit on GSA's authority to deduct overpayments in that section. 31 U.S.C. § 3726(d). But it took no steps to limit the time period in which GSA could exercise its audit

---

10      Plaintiffs note that the only part of GSA's regulations that include a time limit are the ones that address how GSA will deduct overpayments, not the ones that relate to the issuance of notices of overcharge. Pls.' Mot. at 29. But that point does not change the Court's analysis or the deference due to GSA. The regulation – as written without a time limit – is owed deference as long as it is a permissible construction of the statute. And to the extent that 41 C.F.R. § 102-118.435(f) is ambiguous, GSA's interpretation of its own regulations as not including a time limit for the issuance of notices is also entitled to deference. *See Auer v. Robbins*, 519 U.S. 452, 461 (1997).

authority or notify a transportation service provider that it had discovered an overcharge.[11]  *See id.* § 3726.

Plaintiffs challenge that conclusion.  In their opening pleading, they argued that the Court should fill the time gap left by Congress in section 3726 by reading it *in pari materia* with section 13710 so that the 180 day time limit in that section would apply to GSA's section 3726 authority.  *See* Pls.' Mot. at 5 ("Consequently, the 180-day notification period in Section 13710(a)(3) should be read into the audit statute to fill the gap."); *id.* at 29 ("[GSA] largely ignores the fact that there is an applicable statutory timeframe that fills the gap – namely Section 13710(a)(3)(B).").  But it is not the role of the Court to fill statutory gaps; if Congress left a gap, it is to be filled by the implementing agency, and that interpretation is entitled to deference.

In the face of these legal principles, plaintiffs reframed their argument in their reply brief.  In that submission, they took the position that Congress did not actually leave a gap in section 3726 because it intended all along for section 13710 and section 3726 to be read together and for GSA to follow section 13710's 180 day time limit.  Pls.' Reply at 9 ("Congress did not leave a gap here.").  In other words, they contend that Congress's intent was unambiguous and this case

---

11      Plaintiffs again focus on the history of deregulation of the transportation industry to support their position that Congress intended to impose a time limit on GSA's audit authority.  Pls.' Mot. at 22–23.  Specifically, they argue that the 180 day time limit was included in section 13710 because Congress wanted to avoid abusive delays that might otherwise arise by allowing billing disputes to be raised at a later time.  *Id.*  But the fact that Congress was thinking about the need for a time limit to avoid potentially unfair practices and then did not put one in section 3726 actually weighs in favor of the conclusion that Congress did not intend GSA's audit authority to be subject to a shorter time constraint than the three year period it has to deduct discovered overpayments.  Moreover, plaintiffs contend that allowing GSA to notice overcharges at any time within the three year period in section 3726(d) would lead to an anomalous situation that Congress did not intend:  if GSA waits for three years to notice an overcharge, it would not be able to collect that overcharge.  Pls.' Reply at 9.  That concern does not render GSA's reading of the statute impermissible, however, because it does not explain why GSA must exercise its authority within section 13710's time limit.  The gap between 180 days and three years is rather broad, and there is nothing to suggest that an anomalous situation would be created if GSA issued a notice of overcharge on day 181 or even day 600.

should be resolved at *Chevron* step one by reading the two statutes *in pari materia*.  But that position cannot be squared with the statute.

First, the language of section 13710 indicates that it does not cover GSA.  That section authorizes either of the two parties to a transportation contract – the shipper or the motor carrier – to raise billing disputes related to their contract.  49 U.S.C. § 13710.  But GSA is neither a shipper nor a carrier – it is a third party auditing the invoices sent to the shipper and the payments made by the shipper.  *See* 31 U.S.C. § 3726(b).

Second, section 3726 is broader than section 13710:  section 13710 is limited to disputes involving shippers and "motor carriers," 49 U.S.C. § 13710, but GSA's audit power in section 3726 covers bills issued by a broader range of carriers.  31 U.S.C. § 3726(b).  Therefore, the timing provision in the more limited section should not be imported into the broader statute.  *See Erlenbaugh v. United States*, 409 U.S. 239, 245–46 (1972) (declining to read two statutes *in pari materia* despite their similar broad goals because one statute was narrower than the other).

Third, section 3726 is also narrower than section 13710 in a meaningful way.  Section 13710 applies to both governmental and nongovernmental bill disputes while GSA's audit authority under section 3726 is confined to government contracts only.  *See* 31 U.S.C. § 3726(b); 49 U.S.C. § 13710.  In the context of transportation regulation, Congress has previously recognized that the government might be treated differently than private entities when it acts like a shipper.  *See, e.g.*, 49 U.S.C. §§ 10721, 13712, 15504.  So it was not unreasonable for GSA to conclude that Congress gave it wider latitude to conduct audits under section 3726 than Congress would allow nongovernmental shippers under section 13710.  This is especially true where section 3726 is not only silent with respect to a time limit on notices, but provides no specific procedures that GSA must follow.

And fourth, section 3726 is an all-inclusive grant of authority to GSA to handle overpayment issues: subsection (b) grants GSA authority to audit bills, and subsection (d) grants GSA authority to collect overpayments. 31 U.S.C. § 3726(b), (d). The statute's all-inclusive grant of authority, coupled with the fact that Congress mentioned neither section 13710 nor a notification time limit in section 3726, weighs against a conclusion that Congress unambiguously intended another statute in another title to qualify GSA's authority. In fact, plaintiffs concede that Congress was not thinking about section 3726 when it adopted the 180 day limit in section 13710. Pls.' Mot. at 23, quoting 49 U.S.C. § 13710(a)(3)(B) (first three alterations in original) ("While Congress may not have been focused on GSA audits when it adopted the 180-day rule, it says without qualification that '[i]f a shipper seeks to contest the charges . . . [it] must contest the original bill or subsequent bill within 180 days of receipt of the bill . . . .' [T]here is nothing here (or in Section 10762, its predecessor) that precludes its application to GSA when it stands in the shoes of Government shippers . . . .").

The Court therefore finds that GSA's interpretation that there is a three year time limit in section 3726 to be a permissible construction of the statute that is entitled to deference. The undisputed facts demonstrate that all of the notices of overcharge at issue in this case were sent prior to the expiration of the three year time period. Def.'s SOF ¶ 4; Pls.' Response to Def.'s SOF at 3 [Dkt. # 25-3]. GSA is therefore entitled to summary judgment on Count III.

## CONCLUSION

For the reasons stated above, the Court finds that GSA has the authority to audit transportation bills involving negotiated commercial rates, and that GSA therefore did not exceed its authority under section 3726 when it audited plaintiffs' transportation bills. Moreover, the Court finds that GSA's interpretation of section 3726 to permit the issuance of

notices of overcharge at any time within the three year statutory period for the recovery of overpayments is a permissible construction of the statute that is entitled to deference. The Court will therefore grant GSA's motion for summary judgment on Counts I and III, and it will deny plaintiffs' cross-motion for summary judgment on those counts. It will also deny Count II as moot. A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE: September 22, 2014